**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| RYAN HEATHERLY,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 1:25-CV-01722-DAC<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**MEMORANDUM OPINION AND ORDER** |

## INTRODUCTION

Plaintiff Ryan Heatherly challenges the Commissioner of Social Security's decision denying supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Initially, this matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry of Aug. 19, 2025). Later, the parties consented to my exercising jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF #11). For the reasons that follow, I **REVERSE** the Commissioner's decision and **REMAND** the matter for additional proceedings.

## PROCEDURAL BACKGROUND

Mr. Heatherly first applied for SSI in June 2021. (Tr. 183). After his claim was denied on initial review and reconsideration, and following a hearing before the ALJ, Mr. Heatherly sought review in this Court. *See Heatherly v. Comm'r of Soc. Sec.*, No. 1:23-cv-2456, 2024 WL 4181711 (N.D. Ohio Sept. 12, 2024) ("*Heatherly I*"), *report and recommendation adopted,* 2024 WL 4458259 (N.D. Ohio Oct. 10, 2024). I determined the ALJ did not properly articulate how persuasive she

found the medical opinions and prior administrative medical findings. *Id.* The District Court adopted my Report and Recommendation and remanded the matter to the Commissioner for additional proceedings. *Heatherly*, 2024 WL 4458259. On remand, the ALJ held another hearing on and determined Mr. Heatherly was not disabled. (Tr. 836-62, 867-89). The ALJ's decision, dated May 5, 2025, became the final decision of the Commissioner on July 5, 2025, 61 days after the issue date. (Tr. 836-38; *see also* 20 C.F.R. § 416.1484(d). Mr. Heatherly timely filed this action on August 19, 2025. (ECF #1; 42 U.S.C. § 405(g); *see also* Tr. 837).

## FACTUAL BACKGROUND

### I. Personal and Vocational Evidence

At the most recent administrative hearing, Mr. Heatherly was 22 years old. (*See* Tr. 63). He obtained his high school diploma in 2022. (Tr. 637). He has reported multiple attempts to work without success. (Tr. 405, 657, 678, 763). The Social Security Administration's new hire records show Mr. Heatherly was hired for twelve jobs between July 2020 and October 2024. (Tr. 192-93, 1016). Mr. Heatherly maintains he was let go from every position because he lacked transportation or his mental health conditions caused him to be late, so anxious he called off, or overshare details about his symptoms with co-workers. (Tr. 876).

### II. Relevant Educational and Medical Evidence

Mr. Heatherly has a long history of mental health treatment, primarily for schizophrenia. Schizophrenia is a brain disorder that causes people to interpret reality abnormally. *Schizophrenia, Substance Abuse and Mental Health Servs. Admin.*, http://www.samhsa.gov/mental-health/what-is-mental-health/conditions/schizophrenia (last accessed Aug. 28, 2026). When the disorder is active, psychotic symptoms that distort a person's thinking are typically present, like delusions

(false beliefs that persist even when presented with facts), hallucinations (audio or visual), unusual physical behavior, and disorganized thinking and speech. *Schizophrenia, MedlinePlus,* http://medlineplus.gov/schizophrenia.html (last accessed Aug. 28, 2026). The severity, duration, and frequency of symptoms can vary. *What is Schizophrenia, Am. Psychiatric Ass'n,* http://www.psychiatry.org/patients-families/schizophrenia/what-is-schizophrenia (last accessed Aug. 28, 2026). Mr. Heatherly's treatment history is extensively documented in my prior Report and Recommendation:

> Mr. Heatherly obtained his high school diploma on a non-traditional schedule. As a high school sophomore, Mr. Heatherly received services through home instruction due to "significant emotional concerns that were triggered by being in the school setting." (Tr. 299). He then received services at PEP Hopewell, a day treatment center for students with significant behavioral and mental-health challenges.[1] (*Id.*). In January 2019, he was placed in inpatient psychiatric care for five days. (Tr. 300). At the time, he was demonstrating significant concerns, including delusions triggered by the school setting. (*Id.*).
>
> During his junior year, Mr. Heatherly withdrew from North Olmsted Schools and attended Albert Einstein Academy. (Tr. 299). He re-enrolled at North Olmsted to begin his senior year and began taking his courses through the ELC, an online self-paced program that provides instruction, with the goal of graduating in June 2021. (*Id.*). In January 2021, he withdrew from North Olmsted to "pursue a career in music." (*Id.*). By March 2021, he had re-enrolled at North Olmsted and took classes through the ELC. (*Id.*). One ELC teacher offered the following comments:
>
>> Ryan [Heatherly] has completed a half credit of Government and a half credit of Psychology for the entire school year. He still has five credits to complete for graduation. Ryan started off the year motivated and was definitely on track to graduate. He certainly is capable of understanding the work. Ryan failed to stay focused and he decided to drop out to pursue a music career. After a couple of months, he decided to re-enroll back into school. Ryan works best with people who work with him on a personal basis, but his behavior is so erratic and unpredictable at times, it is difficult to maintain a relationship with him.
>
> (Tr. 301).

---

[1] Information publicly available at http://www.pepcleve.org/who-we-are/about-pep (last accessed Aug. 28, 2026).

In his early academic career, Mr. Heatherly received special education services because of his poor social-emotional and behavioral functions. (*Id.*). Later, beginning in 2018 and extending to graduation, Mr. Heatherly received special education services due to his attention concerns such as difficulty with concentration and organization. (Tr. 300). His accommodations included using the ELC platform, organizational assistance, due-date reminders, work completion prioritization, clarification of expectations and directions, extended time on tests, and attentive behavior assistance, including cues to focus or redirect attention to tasks. (*Id.*). Even in a self-paced environment with multiple accommodations, Mr. Heatherly took more than a year after his last re-enrollment to complete his coursework and receive his high school diploma. (Tr. 637).

Mr. Heatherly's medical records indicate an extensive history of mental-health treatment, but the earliest medical records in the Administrative Record before me begin in 2021. On January 28, 2021, Mr. Heatherly attended a telehealth therapy appointment with Brian Spence, APRN, CNP, shortly after discharge from inpatient psychiatric care. (Tr. 378). Mr. Heatherly did not want to discuss his hospitalization and course of treatment or stressors contributing to his hospitalization, but discharge paperwork provided to NP Spence indicated paranoia and delusions, diagnoses of bipolar disorder and cannabis use disorder, and a history of schizophrenia and attention deficit hyperactivity disorder (ADHD). (*Id.*). Mr. Heatherly admitted to a prior psychiatric hospitalization in 2017 or 2018. (*Id.*). Though Mr. Heatherly reported relative psychiatric stability and denied symptoms, NP Spence noted his assessment is "complicated by [Mr. Heatherly's] guardedness"; Mr. Heatherly declined to discuss his hospitalization, and "adamantly declined psychiatry, counseling, case management, alcohol and drug treatment, and primary care." (Tr. 380). NP Spence noted limited insight and moderately impaired judgment and strongly recommended Mr. Heatherly continue receiving Invega Sustenna (paliperidone palmitate), a monthly injectable atypical antipsychotic used to treat mood disorders, including schizophrenia, to prevent decompensation and rehospitalization.[2] (Tr. 378-79). NP Spence's diagnostic impression was psychosis, cannabis use disorder, and a history of ADHD. (Tr. 380). Mr. Heatherly declined medication other than the injection and declined all other mental-health services. (*Id.*). He received the injection on February 8, 2021. (Tr. 377).

On February 18, 2021, Mr. Heatherly attended another telehealth appointment with NP Spence and agreed to attend a psychiatric evaluation. (Tr. 376). He was guarded, cooperative, calm, and pleasant, with a linear and coherent thought process and no abnormal thought content. (*Id.*). NP Spence noted limited insight and moderately impaired judgment. (*Id.*). At the end of the visit, Mr. Heatherly requested a stimulant

---

[2] *See Paliperidone injection*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a615032.html (last accessed Aug. 28, 2026).

for attention and concentration. (*Id.*). He also asked NP Spence what bones and organs are under the shoulders; he wondered if this could be a wing. (*Id.*).

On February 26, 2021, Mr. Heatherly presented at another telehealth appointment with NP Spence and underwent a psychiatric evaluation. (Tr. 369). He initially stated he was not interested in discussing negative topics but reported an incident in 2017 when he was hospitalized: he accidentally pulled the "help string" in the bathroom and six or seven police officers pinned him down, chained him naked to the bed, and took pictures of him. (*Id.*). He stated he was then hospitalized at another facility for two weeks and started taking Abilify; he stopped when he became concerned the drug was "turning him female." (*Id.*). NP Spence again noted the assessment was complicated by guardedness and the presentation and symptoms were consistent with his diagnoses. (Tr. 372-73) ("Psychotic disorder could explain attention and concentration deficit."). He again noted limited insight and moderately impaired judgment. (Tr. 372).

On March 26, 2021, Mr. Heatherly had a telehealth appointment with NP Spence and reported he was recently hired at a fast-food restaurant. (Tr. 365). He was engaged, cooperative, calm, and pleasant, and did not display abnormal thought content or thought processes. (Tr. 366-67). He endorsed ADHD symptoms, such as "staring into space" and "daydreaming," and he requested medication to speed up his schoolwork. (Tr. 365). He denied hallucinations and paranoia but reported waving at the police while carrying cannabis; but when he arrived at his friend's house the cannabis was gone. (*Id.*). NP Spence noted Mr. Heatherly's commentary: "There's something going on with the police department." (*Id.*). Although Mr. Heatherly reported relative psychiatric stability, NP Spence noted he changed topics abruptly on occasion and recalled multiple instances of "authority figures conspiring." (Tr. 367).

On April 22, 2021, Mr. Heatherly attended a telehealth appointment with NP Spence and reported wanting to stop the monthly injections due to arm pain. (Tr. 361). He endorsed doing well and reported "he is getting a second opinion" from another psychiatrist. (*Id.*). Though Mr. Heatherly had not yet been examined for the second opinion, another psychiatrist allegedly told Mr. Heatherly he has post-traumatic stress disorder (PTSD), not schizophrenia. (*Id.*). NP Spence informed Mr. Heatherly to expect decompensation if he declined the injections. (Tr. 363). Mr. Heatherly agreed to continue with injections, but was suspicious and abruptly ended the session. (*Id.*).

At his next telehealth session on April 29, 2021, Mr. Heatherly reported he was not placed on the schedule at work and admitted he had been skipping shifts "here and there." (Tr. 357). He was cooperative but suspicious and had limited insight and moderately impaired judgment. (Tr. 358). Mr. Heatherly reported relative psychiatric stability, but NP Spence noted this was inconsistent with collateral information from

medical records, family members, and his reported employment instability. (*Id.*). Mr. Heatherly refused injections but agreed to take an oral version of the medication, though it would likely result in poorer symptom control and increased side effects. (*Id.*). NP Spence determined it was necessary to see Mr. Heatherly frequently to monitor for non-concordance and decompensation. (Tr. 359).

On May 13, 2021, Mr. Heatherly attended another telehealth session with NP Spence and reported obtaining a new job dishwashing at a bar. (Tr. 352-53). He was cooperative but suspicious and NP Spence suspected Mr. Heatherly was underreporting his symptoms but did not see evidence of decompensation at that time. (Tr. 353-54).

On June 9, 2021, Mr. Heatherly reported to NP Spence that he was terminated from the dishwashing position and currently employed as a "food deliverer," and he was considering moving out of his grandmother's residence to live with his girlfriend. (Tr. 348). NP Spence noted Mr. Heatherly was more guarded and less talkative. (Tr. 349). Mr. Heatherly reported relative psychiatric stability, but NP Spence suspected he was underreporting, especially given his difficulty with maintaining employment without a clear explanation. (*Id.*).

On July 7, 2021, Mr. Heatherly reported to NP Spence that he stopped taking Invega, was considering moving in with a new girlfriend, denied depression and anxiety, endorsed fair attention and concentration, and reported continued employment as a food deliverer. (Tr. 502). NP Spence noted Mr. Heatherly was guarded and cooperative but withdrawn, with limited insight and moderately impaired judgment. (Tr. 503). NP Spence suspected Mr. Heatherly was minimizing his condition and felt his prognosis was limited by insight and a disinterest in clinically appropriate medication. (Tr. 504).

On October 14, 2021, Mr. Heatherly met with his primary doctor Kenneth Kall, D.O., for follow-up after psychiatric care.[3] (Tr. 400). Mr. Heatherly reported that he stopped taking Invega Sustenna because he did not like injections but was restarted on the oral form of the medication while in the emergency department three days prior. (Tr. 401). Dr. Kall noted some anger, poor insight, and poor judgment. (Tr. 403). He prescribed Vraylar, a mood stabilizer. (Tr. 400). Mr. Heatherly's grandmother attended the appointment and expressed feeling overwhelmed because Mr. Heatherly recently lost a phone, lost his car, and has been fighting with friends. (Tr. 401).

On October 29, 2021, Mr. Heatherly was admitted for inpatient psychiatric care for a third time. (Tr. 388). That day, his grandmother called the police and asked them

[3] The administrative transcript does not contain medical reports from Mr. Heatherly's second hospitalization of 2021.

to transport him to the emergency room for delusional and increasingly bizarre behavior and decompensation. (Tr. 569). On initial assessment, he was very disorganized and appeared to be internally stimulated and highly distractible. (*Id.*). When Abu Sayed, M.D., first met with Mr. Heatherly, he was talking to imaginary people. (*Id.*). He went off on a tangent about attending Albert Einstein Academy and that an attorney was taking him there. (*Id.*). Mr. Heatherly either did not respond to questions or his answers were irrelevant. (*Id.*). On mental status examination, Mr. Heatherly was cooperative but very confused and disorganized, with pressured and tangential speech that was, at times, irrelevant and increased psychomotor activity. (Tr. 570). Dr. Syed planned to admit Mr. Heatherly and restart his medications. (*Id.*).

By October 31, 2021, Mr. Heatherly was still "quite disorganized" but was settling down. (Tr. 606). On November 1, he was "not as disorganized" but appeared preoccupied. (Tr. 607). Dr. Syed continued risperidone and added Trazodone. (*Id.*). On November 2, Mr. Heatherly was making steady progress but was still impulsive, had limited insight, his speech frequently became disorganized, and he was somewhat grandiose, unrealistic, and dramatic. (Tr. 612). Dr. Syed added Depakote to his regimen.[4] (*Id.*). On November 3, Dr. Syed noted Mr. Heatherly was responding well to the medications but acted in a bizarre, childish manner, sought attention, and was labile. (Tr. 613). On November 4, Dr. Syed described Mr. Heatherly as "redirectable" and "calm." (Tr. 614). By November 5, 2021, Mr. Heatherly was substantially improved and stable enough to be discharged. (Tr. 571).

On November 16, 2021, Mr. Heatherly followed up with Dr. Kall and expressed concern that he may have bipolar disorder as well. (Tr. 405). He wanted to continue taking medications he received during his inpatient hospitalization (divalproex and risperidone) and reported being open to injections again.[5] (*Id.*). Mr. Heatherly endorsed trying to work at nine different jobs in the past year. (*Id.*). Dr. Kall noted some pressured speech and a mildly tangential thought process. (Tr. 407). Dr. Kall spoke separately with Mr. Heatherly's grandmother, who reported Mr. Heatherly was acting odd and changed his sleep habits and activities. (Tr. 405).

That same day, Mr. Heatherly met with Bianca Stallings, APRN, CNP, who was filling in for NP Spence. (Tr. 481). Mr. Heatherly reported his medications helps and he does not need to talk to anyone after this appointment because he has good control over his symptoms and did not like treatment. (Tr. 482). He denied paranoia

---

[4] Depakote is a brand name for valproic acid, which is used to treat mania in people with bipolar disorder. *See Valporic Avid, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a682412.html (last accessed Aug. 28, 2026).

[5] Divalproex sodium is another name for valproic acid. *See Valporic Avid, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a682412.html (last accessed Aug. 28, 2026). Risperidone is an antipsychotic used to treat schizophrenia and mania. *See Risperidone, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a694015.html (last accessed Aug. 28, 2026).

but said he cut back on videogames because "AI is trying to take over." (Tr. 483). When she asked Mr. Heatherly about drug or alcohol use, he responded, "If you really want to know my addiction, I'm not going to tell you." (*Id.*). NP Stallings convinced Mr. Heatherly to follow up for one more visit. (Tr. 482).

Mr. Heatherly met with NP Spence again on December 17, 2021. (Tr. 472). There, he endorsed working part-time at a pizzeria. (*Id.*). When NP Spence tried to review Mr. Heatherly's recent hospitalization, Mr. Heatherly claimed a nicotine addiction was the reason for his admission. (*Id.*). He felt the medication was helpful. (*Id.*). On examination, he was cooperative and engaged, displayed a tangential thought process, and had limited insight and moderately impaired judgment. (Tr. 474). NP Spence noted Mr. Heatherly's presentation was consistent with mild thought disorganization, but he appeared significantly more insightful and treatment-motivated than in the past. (*Id.*).

On January 6, 2022, at a telehealth session with NP Spence, Mr. Heatherly described medication compliance. (Tr. 465). He stopped delivering food when his car broke down. (*Id.*). NP Spence noted Mr. Heatherly displayed a circumstantial thought process, limited insight, and moderately impaired judgment. (Tr. 467). NP Spence continued prescriptions for divalproex and risperidone. (*Id.*).

Mr. Heatherly attended another telehealth session with NP Spence on January 28, 2022, and reported working at McDonalds but was unable to maintain the job due to having panic attacks when feeling overwhelmed. (Tr. 455). When he had a panic attack, he hid in the restaurant's bathroom. (*Id.*). Mr. Heatherly was cooperative and engaged, with a circumstantial thought process, limited insight, and moderately impaired judgment. (Tr. 457).

On February 23, 2022, Mr. Heatherly endorsed having a new girlfriend, helping his grandmother around the house, watching television, playing videogames, and going for drives. (Tr. 448). He was searching for a job at the time. (*Id.*).

On April 29, 2022, Mr. Heatherly met with NP Spence and reported relative psychiatric stability. (Tr. 657). He then recalled that, around age 15 or 16, he was expelled because a 42-year-old female attorney "for special needs kids" took him to Japan where they engaged in a sexual relationship. (*Id.*). She purportedly fed him Vyvanse. (*Id.*). She threatened to kick Mr. Heatherly out when he stole $10, so he threatened to disclose the affair. (*Id.*). She blocked Mr. Heatherly on the phone and social media, but he knows she still has sexual relationships with her student clients. (*Id.*). When asked about his mood, Mr. Heatherly stated he was "just doing things with [his] friends" but when asked if he was depressed, Mr. Heatherly said he feels depressed and stays "in the basement doing nothing." (Tr. 658). NP Spence noted Mr. Heatherly was engaged and cooperative, his thought process was disjointed, and he had poor insight and fair judgment. (Tr. 659) ("More engaged with provider.

Disclosed details about what seems to be a static delusion. Frequently preoccupied with delusion but overall appears to be improving.").

At a telehealth appointment with NP Spence in May 2022, Mr. Heatherly reported graduating high school and doing okay. (Tr. 646-47). He was somatically preoccupied at the beginning of the visit, which NP Spence attributed to suspected residual psychosis. (Tr. 648).

In June 2022, Mr. Heatherly told NP Spence he was depressed most of the time, felt tired, and had fair attention and concentration. (Tr. 638). He denied psychotic symptoms but admitted to pulling out his hair three to four times a day. (*Id.*). NP Spence continued his medications. (Tr. 639).

Mr. Heatherly met with NP Spence again in October 2022, where he endorsed medication compliance. (Tr. 828). He reported trying to work at Panera but quitting after orientation. (*Id.*). He again recalled his affair with a female attorney in Japan. (*Id.*). He was open and cooperative, euthymic and coherent, but had a disjointed thought process, severely impaired insight, and moderately impaired judgment. (Tr. 830). NP Spence continued his medications. (*Id.*).

In December 2022, Mr. Heatherly reported forgetting to take his medication about once a week. (Tr. 819). He also reported a decrease in appetite, low motivation and energy, fair attention and concentration, depression and difficulty expressing emotions, and anxiety with flashbacks to his prior hospitalizations. (*Id.*). He was open and cooperative, euthymic and coherent, but had a disjointed thought process and moderately impaired insight and judgment. (Tr. 820-21).

In January 2023, Mr. Heatherly reported feeling better and could enjoy activities like playing video games. He denied psychosis and mania but claimed to feel unsafe at times "because fast food restaurants know he knows recipes after working there." (*Id.*). NP Spence noted Mr. Heatherly was more pressured and disjointed than prior visits but he remained appropriate for outpatient treatment. (Tr. 807). NP Spence restarted Mr. Heatherly's Invega Sustenna injections in lieu of oral medication and continued divalproex and risperidone. (*Id.*).

On January 13, 2023, Mr. Heatherly presented with his grandmother to receive his Invega Sustenna injection. (Tr. 794). There, he complained that someone stole his wallet, keys, and cell phone from his car. (*Id.*). His grandmother informed the nurse that Mr. Heatherly just misplaced his things. (*Id.*). The nurse noted Mr. Heatherly was restless, circumstantial, tangential, and experiencing possible persecutory delusions. (*Id.*).

On February 14, 2023, Mr. Heatherly attended an initial mental-health assessment where mental status examination revealed fleeting eye contact, distractible and

> tangential thought process, perceptual delusions, distracted attention, and impaired judgment. (Tr. 764-65).
>
> On March 9, 2023, NP Spence noted Mr. Heatherly was cooperative and engaged, goal-directed, euthymic, and calm, with moderately impaired insight and mildly impaired judgment. (Tr. 743-44).
>
> At his most recent appointment with NP Spence in June 2023, Mr. Heatherly reported relative psychiatric stability and was cooperative, engaged, euthymic, agreeable, and calm, and displayed moderately impaired insight. (Tr. 690-91).

*Heatherly*, 2024 WL 4181711, at *1-6.

On remand, the ALJ received additional medical records from June 2023 through March 2025. On June 29, 2023, Mr. Heatherly reported relative psychiatric stability and medication compliance. (Tr. 1523). He was engaged, cooperative, and open, with intact associations but displayed a disjointed thought process and moderately impaired insight. (*Id.*). NP Spence provided his monthly injection of Invega Sustenna. (Tr. 1512).

In July, Mr. Heatherly reported relative psychiatric stability and medication compliance but wanted to decrease the dose of Invega Sustenna or switch to an alternative medication because it caused weight gain. (Tr. 1496). NP Spence continued that medication "for now" and agreed to consider a change if Mr. Heatherly gained more weight. (*Id.*). Mr. Heatherly received his monthly injection that day, and again in August and September. (Tr. 1488-89, 1483, 1471).

In October, psychiatrist Andrew Hunt, M.D., took over Mr. Heatherly's psychiatric care. (Tr. 1460). Mr. Heatherly explained his history of schizophrenia but reported "no major symptoms" at present. (*Id.*). Except for moderately impaired judgment, Dr. Hunt documented normal findings on the mental status examination. (Tr. 1461-62). Dr. Hunt provided Mr. Heatherly's monthly injection. (Tr. 1452-53, 1461). During a follow-up visit later that month, Mr. Heatherly discussed his failed attempts to find a job and described a history of oversharing and not

observing boundaries. (Tr. 1442). Dr. Hunt made the same findings about Mr. Heatherly's mental status and continued his monthly injection. (Tr. 1445-46).

In January 2024, Dr. Hunt prescribed Vyvanse for ADHD to address symptoms of inattention. (*See* Tr. 1340). Mr. Heatherly reported obtaining a job at Papa John's. (Tr. 1370). In February, Dr. Hunt switched Mr. Heatherly from Invega Sustenna, a monthly injectable, to Invega Hafyera, a twice-yearly injectable. (*See* Tr. 1342). In March, Mr. Heatherly met with the resident pharmacist at Dr. Hunt's office and reported tolerating both medications and feeling "pretty good." (Tr. 1340).

In mid-April, Mr. Heatherly spoke with his case manager and reported running out of Vyvanse two weeks ago and missed his most recent telehealth appointment. (Tr. 1330). Mr. Heatherly spoke with his case manager a few days later and reported difficulty concentrating. (Tr. 1323). Later that month, Mr. Heatherly explained he found another job doing landscaping but "had problems working due to difficulty doing tasks correctly, finishing tasks, doing things wrong, and making errors," and was shifted to another work crew on reduced hours. (Tr. 1295).

By the end of July, Mr. Heatherly's condition declined. His grandmother called his behavioral health provider and expressed concern about his behavior, she filed a restraining order against Mr. Heatherly because he was threatening her, he was kicked out of his father's house for threatening to hurt himself earlier that day, his girlfriend kicked him out of their home the weekend before that, and he "tried to pick a fight" with the police and ended up in jail. (Tr. 1273). Mr. Heatherly's grandmother was concerned he was not taking his medication. (*Id.*).

On August 1, Mr. Heatherly was transported to the emergency department. (Tr. 1558). Mr. Heatherly's father reported he had been destructive at home and fighting with the family and

expressed concern Mr. Heatherly might hurt himself or someone else. (*Id.*). His father also reported Mr. Heatherly had not been compliant with treatment and was talking to himself, acting recklessly, trying to break into his grandmother's home, pacing the halls, bumping into things, not sleeping, threatening to kill his uncle, and behaving bizarrely. (Tr. 1559). The neighbors had been calling the police on Mr. Heatherly daily. (*Id.*). Mr. Heatherly said he pulled his car into his grandmother's driveway to leave her something when his uncle pulled into the driveway, threatened him, and chased him through town in his car. (Tr. 1558). Mr. Heatherly's father could not corroborate this story and said the police picked up Mr. Heatherly when he ran out of gas and brought him home. (Tr. 1559). On intake, Mr. Heatherly presented with delusions and visual hallucinations. (Tr. 1592). The treating provider determined Invega Hafyera wore off too quickly and, with Mr. Heatherly's agreement, provided an injection of Invega Sustenna. (Tr. 1559). Mr. Heatherly symptoms improved over the course of a week. (*Id.*). Before discharge on August 7, Mr. Heatherly was counseled on the importance of medication compliance and follow-up treatment. (*Id.*).

Within a week of discharge from inpatient hospitalization, Mr. Heatherly and his grandmother met with a registered nurse for medication management. (Tr. 1251). Mr. Heatherly explained this latest episode started soon after an argument with his girlfriend and reported receiving an injection of Invega Sustenna at the hospital. (*Id.*). He endorsed nervousness and anxiousness, a decreased need for sleep, erratic or racing thoughts, increase in goal-directed activity, delusions, difficulty concentrating, irritability, increased fatigue, and sleep disturbance. (*Id.*). The nurse noted Mr. Heatherly was irritated, distractible, tangential, and had loose

associations; expressed persecutory delusions; and had poor insight, grossly impaired judgment, and impaired memory. (*Id.*).

At another medication management appointment on August 29, the provider noted Mr. Heatherly received an injection of Invega Sustenna while in the hospital but was now refusing the injection. (Tr. 1217). He denied psychotic symptoms and claimed he was hospitalized because his family lied to the police and his healthcare providers. (*Id.*). Mr. Heatherly agreed to continue risperidone. (*Id.*).

Mr. Heatherly met with Dr. Hunt again in September and denied any problems. (Tr. 1174). Dr. Hunt noted the following:

> He denies problems with his grandmother, but then relates story of several interactions with the police last week. He described being "kidnapped" and taken to the hospital. He reports that they "knocked him out" multiple times, and he doesn't remember anything about these incidents. He discusses his uncle trying to hit him with a car. He refuses to allow [a long-acting injectable]. When asked if we can contact his grandmother, he indicates that she is too busy making lasagna and won't allow it. He denies anger, irritability, and violent intentions towards anyone.

(*Id.*). Mr. Heatherly refused his Invega Sustenna injection but agreed to an increase in risperidone. (*Id.*).

In December 2024, Mr. Heatherly reported obtaining a new job. (Tr. 1148). In February 2025, he reported another new job. (Tr. 1121).

Also in February, Mr. Heatherly met with his case manager and displayed limited speech and inconsistent eye contact. (Tr. 1115). His case manager noted he was "observed to be likely thought blocking." (Tr. 1116). He admitted missing his most recent psychiatric appointments and was not taking his medication as prescribed. (*Id.*).

On March 6, Mr. Heatherly's case manager met with him at home and escorted him to his scheduled psychiatric appointment. (Tr. 1099). During that appointment, Mr. Heatherly was cooperative but constricted and described hallucinations and preoccupation. (Tr. 1089). The provider continued risperidone and prescribed benztropine for schizophrenia and amantadine for ADHD. (*Id.*). Mr. Heatherly's case manager escorted him to pick up his prescriptions and assisted him home. (Tr. 1083).

In summary, Mr. Heatherly has schizophrenia and suffered three episodes of psychotic behavior between December 2020 and August 2024, each requiring inpatient hospitalization. The record does not detail the December 2020 hospitalization. The second hospitalization occurred after Mr. Heatherly stopped taking his medications as prescribed and the third occurred when the medication wore off sooner than anticipated. Between those episodes, his symptoms were less severe but still present. After his most recent inpatient hospitalization, Mr. Heatherly's providers noted his limited insight and disinterest in medication are likely barriers to his compliance with treatment. (*See, e.g.,* Tr. 484 ("Limited insight likely a barrier to staying consistent with outpatient mental health"); 504 ("Prognosis likely limited by insight and disinterest in clinically appropriate medication"); 807 ("Assessing appropriateness for FIRST Episode Psychosis program but engagement will be challenging"); 1580 ("Prognosis: guarded [due to] poor medication compliance and limited supports")). In that time, Mr. Heatherly sought or was hired for many positions but for various reasons could not keep any job. (*See, e.g.,* Tr. 300, 326, 328, 348, 353, 356, 415, 418, 657, 719, 732, 763, 1121, 1148, 1295, 1392, 1423, 1435, 1442, 1435).

## III. Medical Opinions

On July 30, 2021, a state agency psychological consultant reviewed Mr. Heatherly's records and assessed his mental residual functional capacity (RFC). (Tr. 63-69). The consultant determined Mr. Heatherly was moderately limited in the ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (5) interact appropriately with the general public; (6) accept instructions and respond appropriately to criticism from supervisors; and (7) respond appropriately to changes in the work setting. (Tr. 67-68). The consultant opined Mr. Heatherly can complete one- to four-step work-related tasks, is limited to work tasks not involving prolonged periods of attention and concentration, and can handle occasional changes in work-related tasks. (*Id.*). The consultant also determined Mr. Heatherly should be limited to work-related tasks in a non-public environment that do not require negotiating with, instructing, persuading, or directing the work of others. (Tr. 68). On reconsideration, another state agency psychological consultant reviewed updated records and offered similar opinions, differing only to opine Mr. Heatherly can work "in a stable setting with predictable expectations and infrequent routine changes" instead of "occasional changes in work-related tasks." (*Compare* Tr. 67-68 *with* Tr. 75-76).

On June 24, 2022, NP Spence completed a mental impairment questionnaire on Mr. Heatherly's behalf. (Tr. 567-68). Based on clinical findings of psychosis, paranoia, thought disorganization, delusions, depression, and anxiety, NP Spence described Mr. Heatherly's functioning as follows:

| Sustained Concentration and Persistence Limitations | Unable to meet competitive standards | No useful ability to function |
|---|---|---|
| Carry out very short and simple instructions | X | |
| Carry out detailed instructions | | X |
| Maintain attention and concentration for extended periods of time | | X |
| Perform activities within a schedule | X | |
| Manage regular attendance and be punctual within customary tolerances | | X |
| Sustain an ordinary routine without special supervision | | X |
| Work in coordination with or in proximity to others without being distracted by them | X | |
| Complete a normal workday and workweek without interruption from symptoms | | X |
| Perform at a consistent pace without unreasonable number and lengths of rest periods | | X |

| Understanding and Memory Limitations | Unable to meet competitive standards | No useful ability to function |
|---|---|---|
| Remember locations and work-like procedures | | X |
| Understand and remember very short and simple instructions | X | |
| Understand and remember detailed instructions | | X |

| Social Interaction Limitations | Unable to meet competitive standards | No useful ability to function |
|---|---|---|
| Interact appropriately with the general public | X | |
| Ask simple questions or request assistance | | X |
| Accept instruction and respond appropriately to criticism from supervisors | | X |
| Get along with coworkers or peers without distracting them or exhibiting behavioral extremes | X | |
| Maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness | X | |

| Adaptation Limitations | Unable to meet competitive standards | No useful ability to function |
|---|---|---|
| Respond appropriately to changes in the work setting | | X |
| Be aware of normal hazards and take appropriate precautions | X | |
| Set realistic goals or make plans independently of others | X | |

(*Id.*). The impairment questionnaire defines "unable to meet competitive standards" as the claimant "cannot satisfactorily perform this activity independently, appropriately, and effectively on a sustained basis and in a regular work setting." (Tr. 567). "No useful ability" means the claimant cannot perform the activity in a work setting. (*Id.*). NP Spence also opined Mr. Heatherly would always be off-task and absent from work because he "has been unable to maintain any level of employment." (Tr. 568).

On February 13, 2023, Charles Misja, Ph.D., met with Mr. Heatherly for a consultative examination. (Tr. 678-82). During the hour-long interview, Dr. Misja noted:

> The claimant has been hospitalized several times at St. Vincent, St. John's, Lutheran, Lakewood and Fairview Hospital and the most recent was in December of 2021 and he was there for two weeks. He reported that he's been diagnosed with schizophrenia, depression, anxiety, PTSD and OCD. He stated he is easily angered and oppositional to direction. He stated he was jumped while in the hospital by seven police officers and was strapped down and stuck for a week. He reported seeing "shadows" and people abruptly disappearing from view. He reported that his cat "teleported." He sees a psychologist at The Center [for Families and Children] on a monthly basis.
>
> * * *
>
> The longest the claimant has ever had a single job was McDonald's for eight months and he was fired "because of covid." He worked for a demolition crew with his father, fast food, and stated he was fired from all [of] them. He stated he was fired because he couldn't pay attention and has daydreams that put him into a trance. He stated he had difficulty learning what to do and the complexity of multi-tasking [was] difficult. He stated he got migraines from the pace of work.

(Tr. 679-80).

Dr. Misja described Mr. Heatherly as clean, cordial, and cooperative, but intense throughout the interview, demonstrating pressured speech and loose associations. (Tr. 680). Mr. Heatherly was depressed and mildly labile with a flat affect but Dr. Misja did not find evidence of hallucinations, delusions, grandiosity, preoccupations, suspiciousness, aggression, hostility, paranoid ideation, or unusual thought content. (Tr. 680-81). After sensorium and cognitive function testing, Dr. Misja rated Mr. Heatherly in the average range of intelligence. (*Id.*). Summarizing the interview, Dr. Misja noted Mr. Heatherly's schizophrenic symptoms were reasonably well-controlled by medication, but he voiced persecutory themes (by parents, family caretakers, police, and supervisors) and displayed poor insight and judgment. (*Id.*). Dr. Misja also noted Mr. Heatherly had difficulty focusing during the interview and needed frequent redirection. (Tr. 681-82). Based on the clinical interview and 25 pages of medical records, Dr. Misja opined Mr. Heatherly "should be able to understand, remember, and implement ordinary instructions," will likely have "intermediate" problems in maintaining attention, concentration, persistence, and pace to perform simple and multi-step tasks, and will have "intermediate to severe" problems responding appropriately to supervision and coworkers and responding appropriately to work pressures. (Tr. 682).

## IV. Administrative Hearing

At the most recent hearing in April 2025, Mr. Heatherly reported he went to the emergency room twice in 2024 for mental health symptoms. (Tr. 872). In one instance, he had a panic attack prompted by a flashback to when he was jumped by police officers; he was discharged several hours later after he calmed down. (Tr. 872-73). In the other, he was admitted for 15 days of inpatient psychiatric care. (Tr. 873).

At the time of the hearing, Mr. Heatherly was taking risperidone and "an ADHD medicine" that is not a stimulant. (*Id.*). He stopped taking the long-acting injection medication because the pain of the shot would last for a week and the medication caused weight gain. (Tr. 873-74). Despite medications, he continues to have delusions and hallucinations, but he does not act on them. (*Id.*).

Mr. Heatherly testified he cannot work because he does not associate properly with authority and overshares personal details about his conditions. (*See* Tr. 875) ("I'll start talking about the things I hear [voices] and like what I think it means in the grand scheme of things in the universe and stuff like that."). Since the prior hearing in 2023 Mr. Heatherly has unsuccessfully tried to work but lost jobs because he was late, lacked transportation, or called off too many times due to the anxiety of "just going into work in general." (Tr. 876). When he worked in janitorial services at a hospital, he "wander[ed] around," and would get distracted whenever he started cleaning tasks. (Tr. 876-77).

The ALJ asked Mr. Heatherly about his capacity to return to a former dishwashing position where he would do "the same thing over and over" and "not really hav[e] to go out or deal with anybody." (Tr. 878). Mr. Heatherly explained he could not return to any job because his mental health impairments have "fractured" his ability to work and he has "some kind of PTSD" from being let go from former positions because "something so little just destroyed the manager's mind." (*Id.*). For example, he described feeling traumatized from being fired for using marijuana during his shift. (Tr. 879) ("I got fired from a job for smoking weed in the back and [the manager] freaked out so bad he almost punched me in the face and told me to leave and never come back."). On that topic, the following exchange occurred between the ALJ and Mr. Heatherly:

Q: But wait a second. Do you not see why it was inappropriate for you to smoke marijuana on the job?

A: At the time it was what I was using it for trying to cope with, you know, PTSD and stuff, but it wasn't legal at the time, and I was 16. So, they didn't like that, but I do realize it was inappropriate, but I don't think it was—I don't think the punishment was necessary.

Q: Okay.

A: I think they could just been like put it out, get back to work, and there wouldn't have been complete like spiral down.

Q: Okay. So, in other words, you feel that your boss, the employer, didn't respond appropriately to your bad behavior, right? As a result, you get flashbacks because he yelled at you and fired you?

A: It was more than just yelling at me.

(Tr. 879) (cleaned up). Mr. Heatherly's counsel picked up the line of questioning:

Q: Is that always kind of how it shakes out where you, you know, I think what the Judge and I are hearing is how could you be smoking weed at work and think that that's okay or not something that you would be terminated for which makes us—

A: Well, the guy—

Q. —perhaps question your judgment. Say it again.

A: The management – the manager that caught me himself had smoked weed all his life. So, his reaction was inappropriate because he's being a hypocrite.

Q: Did he smoke weed at work while working?

A: I mean I've seen his eyes completely bloodshot red before he came into work. Maybe not at the job, but I wasn't on the property. I was like behind the Little Caesars close to the building and then when I came back I smelled like it, but I'm a dishwasher. Nobody is going to smell me.

Q: Do you often feel like other people are perceiving situations differently than you are?

A: Yes.

Q: Does that lead to a lot of disagreements with other people?

A: I would assume so, but I have tried to accommodate other people's needs as much as they my own and they just somehow, like for instance, all these jobs, like at Boston Market I overshared my personal details and my personal life that caused me to end up back with my grandmother with my manager and he got like, I don't know, scared or worried or whatever and he fired me. Little Caesars, my best friend overdosed on pills and died, and the manager knew that I was friends with her. So, she fired me. At—like it just goes on and on and on.

(Tr. 880-81) (cleaned up). The ALJ then interjected:

Q: Well, wait a second. You're jumping to the conclusion your manager fired you because of that. Did she actually say to you I'm firing you because your best friends with a girl that just OD'd?

A: I know it's what happened because she's friends with my best friend and that's what she told my best friend on why she fired me, you know, when they were talking, gossiping with each other and they came back to me and told me what she said.

(Tr. 881). Mr. Heatherly recognized it is possible his friend was exaggerating to make him feel better but claimed "deep down in my heart I feel like that's really how she felt. Like she thought I was spiritually, or something connected to her, and she didn't want the bad juju near the Little Caesars." (*Id.*).

## STANDARD FOR DISABILITY

Eligibility for benefits turns on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 416.905(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Mr. Heatherly had not engaged in substantial gainful activity since April 28, 2021, the application date. (Tr. 841). At Step Two, the ALJ identified "schizophrenia, attention deficit disorder, and post-traumatic stress disorder" as severe impairments. (*Id.*). At Step Three, the ALJ found Mr. Heatherly's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 842).

At Step Four, the ALJ determined Mr. Heatherly's RFC as follows:

> After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: can understand, remember, and apply information to complete simple and detailed instructions in a routine work environment, and instructions can be provided in either oral, written, diagrammatic, or demonstrated; can maintain concentration, persistence, and pace for work duties that are short-cycle, repetitive in nature, and routine in nature with infrequent changes; can interact with others to perform work tasks that do not require tandem-type work and do not require being responsible for the safety of others or directing the work of others; and can interact with the general public but should avoid work that requires direct provision of services to the general public, but incidental contact is acceptable (*e.g.*, dishwasher).

(Tr. 843-44). In assessing the RFC, the ALJ stated she considered "the entire record" and "all symptoms" in light of the medical and other evidence in the record. (Tr. 843-44). She found Mr. Heatherly's medically determinable mental impairments could reasonably be expected to cause his alleged symptoms, primarily audio hallucinations, poor concentration, and difficulty associating with others, but found his statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical and other evidence in the record. (Tr. 844). She determined the mental status examinations, Mr. Heatherly's course of treatment, and his activities of daily living are "not consistent with disabling mental impairment and more consistent with the stated [RFC]." (Tr. 853). The ALJ noted Mr. Heatherly was "sometimes guarded and/or suspicious" but "consistently cooperative and pleasant" on examination. (*Id.*). His thought process was "usually goal directed, linear, and coherent" but "was loosely associated on one occasion and sometimes tangential, circumstantial, or disjointed." (*Id.*). Mr. Heatherly sometimes experienced delusions and paranoia but his thought content was usually not abnormal. (*Id.*). His insight and judgment were, at times, no more than moderately impaired. (*Id.*).

The ALJ also noted Mr. Heatherly was psychiatrically hospitalized twice during the relevant period, once after "disengaging from treatment" between July and October 2021, and a second time in August 2024 because his long-acting injectable medication lost effectiveness before he was due for a repeat injection. (*Id.*). In addition, the ALJ characterized Mr. Heatherly's course of treatment as inconsistent with a finding of disability because he regularly received outpatient mental health services but "has not required or received frequent or intensive outpatient mental health services." (*Id.*). The activities the ALJ determined were inconsistent with disability include earning a high school diploma, driving, helping his grandmother when she broke her hip, taking his girlfriend to work and her child to the Autism Center, spending time with his grandmother and girlfriend, going out to eat and playing video games. (*Id.*).

The ALJ was not persuaded by NP Spence's medical opinion. (Tr. 848). The ALJ determined such extreme limitations were not supported by the mental status examinations or Mr. Heatherly's abilities to drive, earn his diploma, and have friends/girlfriends, and were inconsistent with the other medical opinions and Mr. Heatherly's course of treatment. (Tr. 848-49).

The ALJ found Dr. Misja's opinion partly persuasive, explaining that the doctor used vague terminology to describe the severity of Mr. Heatherly's limitations. (Tr. 850). She also emphasized that Dr. Misja's mental status examination did not support the opined limitations in maintaining attention, concentration, persistence, and pace or in responding appropriately to supervision and coworkers. (Tr. 850-51). And she was not persuaded as to Dr. Misja's opinion that Mr. Heatherly is limited in responding appropriately to work pressures because while Mr. Heatherly told Dr. Misja he has been fired from multiple jobs due to his impairments, that statement is inconsistent with

Mr. Heatherly's other statements in the record indicating he was fired from some jobs for reasons not related to his impairments. (Tr. 851).

The ALJ concluded the state agency psychological consultants' opined limitations were not fully persuasive because they were not phrased in vocationally relevant terms. (Tr. 854). The consultants determined Mr. Heatherly has moderate limitations in all four areas of mental functioning, particularly in understanding and remembering short simple instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, completing a normal workday/work week without interruptions from symptoms and performing at a consistent pace, interacting appropriately with the public and responding appropriately to criticism from supervisors, and responding appropriately to changes in the work setting. (Tr. 67-68, 75-76). Drawing from the consultants' findings that Mr. Heatherly is moderately limited in all four areas of mental functioning, the ALJ assessed the above-described restrictions. (Tr. 854).

The ALJ concluded Mr. Heatherly did not have past relevant work. (Tr. 855). At Step Five, the ALJ determined Mr. Heatherly could perform work in the national economy, including as an order picker, wall cleaner, and cleaner, housekeeper. (*Id.*). Thus, the ALJ concluded Mr. Heatherly was not disabled. (Tr. 856).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833

(6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## DISCUSSION

As noted earlier, the District Court previously remanded this matter to the Commissioner because the ALJ did not properly articulate how persuasive she found the medical opinions and prior administrative medical findings. At present, Mr. Heatherly argues the ALJ again "improperly failed to address the supportability and consistency of the medical opinions." (ECF #9 at PageID 1685).

As part of the RFC assessment, the ALJ must review all medical opinions and explain how persuasive she finds them. *See* 20 C.F.R. § 416.920c(b); *see also Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). The ALJ considers five factors to determine persuasiveness: (1) supportability; (2) consistency; (3) the source's relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) the source's specialization; and (5) any other factors that support or contradict a medical opinion. 20 C.F.R. § 416.920c(c)(1)-(5). The regulations require the ALJ to "explain how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinions," those being the two principal factors. *See id.* § 416.920c(b)(2). Supportability is "the extent to which a medical source's opinion is supported by relevant objective medical

evidence and the source's supporting explanation," while consistency is "the extent to which the opinion is consistent with evidence from other medical sources and nonmedical sources in the claim." *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 5859, 2017 WL 168819 (Jan. 18, 2017). The ALJ's explanation should "generally include[] an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or prior administrative medical finding is with other evidence in the claim." *Id.* The reasons for the ALJ's conclusions must be stated in a manner that allows the reviewing court to "trace the path of the ALJ's reasoning" from evidence to conclusion. *Stacey v. Comm'r of Soc. Sec.*, 451 F.App'x 517, 519 (6th Cir. 2011). If the ALJ discusses both consistency and supportability and substantial evidence supports that discussion, the court may not disturb the ALJ's findings. *Paradinovich v. Comm'r of Soc. Sec.*, No. 1:20-cv-1888, 2021 WL 5994043, at *7 (N.D. Ohio Sept. 28, 2021), *report and recommendation adopted*, 2021 WL 5119354 (N.D. Ohio Nov. 4, 2021).

**I. NP Spence**

Mr. Heatherly contends the ALJ did not "consider the totality of the medical evidence which, contrary to her erroneous conclusion, was supported and was consistent with the medical evidence in this matter." (ECF #9 at PageID 1686). He lists all the evidence purportedly supporting his position but does not specifically identify relevant evidence the ALJ did not address that could reasonably show the ALJ's evaluation is not supported by substantial evidence. (Tr. 1686-90). As the Commissioner correctly points out, this tactic does little to advance Mr. Heatherly's claim because even if he can point to substantial evidence supporting his position that NP Spence's opinion is persuasive, the court cannot overturn the ALJ's decision "so long as

substantial evidence also supports the conclusion reached by the ALJ." *Jones,* 336 F.3d at 477. But after reviewing the pertinent evidence and the ALJ's decision, I find the ALJ has not met her burden to articulate how she considered the supportability and consistency of NP Spense's opinion.

The ALJ determined NP Spence's opinion is not persuasive. Initially, addressing supportability of the opinion, the ALJ compared the clinical findings NP Spence listed in support of his opinions, including psychosis, paranoia, thought disorganization, delusions, depression, and anxiety, and found that although the treatment records showed some abnormal findings in behavior, thought content, and thought process, Mr. Heatherly was usually cooperative, goal-directed, linear, and coherent, did not have abnormal thought content, and his judgment was no more than moderately limited. (Tr. 848). The ALJ then determined "such severe and extreme limitations are not supported by [Mr. Heatherly's] abilities to drive, earn his diploma, and have friends/ girlfriends." (*Id.*). Next, addressing consistency with other evidence of record, the ALJ emphasized the lack of other medical opinions or prior administrative medical findings similar to NP Spence's opinion. (Tr. 848). Last, the ALJ determined the severity of the opinion was not consistent with Mr. Heatherly's course of treatment, explaining that he "did not require or receive frequent or intensive outpatient mental health services," and he was hospitalized "after disengaging from treatment at CHS earlier in the year." (*Id.*).

The ALJ's explanation does not meet the minimum articulation requirements.. First, the ALJ did not explain how Mr. Heatherly's daily activities and educational attainment were inconsistent with NP Spence's opinion nor is it obvious from the record. An ALJ may discount a treating source's medical opinion on the premise that the claimant's reported activities do not

comport with the opined limitations. *See Irvin v. Soc. Sec. Admin,* 573 F.App'x 498, 501 (6th Cir. July 22, 2014). But the ALJ must explain how that evidence conflicts with the medical opinion. *See Brooks v. Soc. Sec. Admin.,* 430 F.App'x 468, 480 (6th Cir. July 15, 2011); *see also Mason v. Comm'r of Soc. Sec.,* No. 22-cv-10012, 2023 WL 2480734, at *4 (E.D. Mich. Mar. 13, 2023) (holding it is incumbent on the ALJ to explain how the evidence cited by the ALJ undermined the medical providers' opinions where the conflict is not clear).

To start, the ALJ did not explain why, on this record, Mr. Heatherly's ability to drive shows greater capacity for work. True, obtaining a driver's license and driving a vehicle necessarily require some degree of concentration, particularly where the record shows Mr. Heatherly briefly worked as a delivery driver in 2021. (*See* Tr. 348, 502). But Mr. Heatherly drove during a period of active psychosis just before his last admission for inpatient hospitalization. (Tr. 1573) ("the police picked him up in Lakewood when he ran out of gas and brought him home"). On admission, he was cooperative, and his thought process was logical and coherent, but he was exhibiting bizarre behavior, responding to questions in a bizarre manner, and showing poor impulse control, judgment, insight, and memory. (Tr. 1592). It is not controversial to say Mr. Heatherly could not perform the mental functions necessary for typical work activity at the time he was hospitalized. If Mr. Heatherly could still drive while highly symptomatic, it is not apparent how his driving is inconsistent with NP Spence's opinion. It is thus "incumbent on the ALJ to explain" how driving undermined NP Spence's decision and the ALJ did not do so. *See Mason*, 2023 WL 2480734, at *4.

The ALJ similarly did not explain how Mr. Heatherly's ability to obtain his high school diploma was inconsistent with NP Spence's opinion once the circumstances of his education are

considered. The substantiality of evidence "must be based upon the record taken as a whole" and "take into account whatever in the record fairly detracts from its weight." *Brooks*, 531 F.App'x at 641. Ordinarily, a claimant's educational attainment is good evidence of the claimant's mental functional capacity. *See Long v. Comm'r of Soc. Sec.*, No. 2:19-cv-5458, 2020 WL 7382354, at *9 (S.D. Ohio Dec. 16, 2020), *report and recommendation adopted,* 2021 WL 247926 (S.D. Ohio Jan. 26, 2021). While Mr. Heatherly graduated during the relevant period, the record documents he received significant support and accommodation in school through special education services, including "organizational assistance, due date reminders, and work completion prioritizing; clarification of expectations and directions; preferential seating near front, source of instruction, or instruction away from distractions; extended time on tests; attentive behavior assistance cues to focus or redirect attention to task via comprehension checks . . ." (Tr. 300). He was on a self-paced program and was excused from the consequences of not passing four required graduation tests. (Tr. 339). The accommodations Mr. Heatherly received in the form of aid, reminders, instruction away from distractions, extended time, self-paced instruction, and redirection to tasks in his pursuit of his diploma suggest he is "unable to meet competitive standards" or has "no useful ability to function" in "understanding, remembering, and applying information" and "concentrating, persisting, and maintaining pace." (*See* Tr. 567-68). The ALJ did not address the circumstances of Mr. Heatherly's education, so the bare conclusion that his obtaining a diploma is inconsistent with NP Spence's opined limitations lacks substantial evidence. Again it is "incumbent on the ALJ to explain" how Mr. Heatherly's education undermined NP Spence's decision and the ALJ did not do so. *See Mason*, 2023 WL 2480734, at *4. Without that

explanation, I cannot meaningfully review the ALJ's conclusion that Mr. Heatherly's activities undermine NP Spence's opinion.

The second omission in the ALJ's explanation is the ALJ determined the severity of the opinion was not consistent with Mr. Heatherly's infrequent and outpatient mental health treatment, but the record suggests that his limited treatment may result from his conditions.

A conservative course of treatment is generally a suitable reason to discount a medical opinion. *See, e.g., Lester v. Comm'r of Soc. Sec.*, 596 F.App'x 387, 389 (6th Cir. 2015). But "ALJs must be careful not to assume that a patient's failure to receive mental-health treatment evidences a tranquil mental state. For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009). Although the Sixth Circuit has not established a per se rule that the existence of a mental impairment constitutes an acceptable reason for the failure to follow prescribed treatment, noncompliance with treatment or medication could be explained by mental illness, rather than suggesting a lack of symptoms. *Burge v. Comm'r of Soc. Sec*., No. 1:13-cv-87, 2013 WL 6837192, at *3 (N.D. Ohio Dec. 26, 2013). The ALJ properly relies on a lack of treatment or noncompliance with medication when there is no evidence linking the absence of treatment or noncompliance to a mental health disorder or otherwise explaining it. *See Kestel v. Comm'r of Soc. Sec.*, 756 F.App'x 593, 599 (6th Cir. 2018); *see also Bass v. Colvin*, No. 3:14-cv-109, 2015 WL 1299266, *22 (N.D. Ohio Mar. 23, 2015) (finding no error in ALJ's consideration of claimant's failure to obtain treatment and take medication because the claimant did not identify evidence that his mental condition caused that failure). Conversely, where that link exists, the ALJ must discuss the impact of that evidence. *See Uhl v. Comm'r of Soc. Sec.*, No. 1:20-cv-749, 2021 WL 2188303, at *10 (N.D.

Ohio May 14, 2021) (remanding where the ALJ acknowledged the claimant gets severely depressed and stops taking her medications but did not explain how that factored into his analysis), *adopting report and recommendation,* 2021 WL 2187982 (N.D. Ohio May 28, 2021).

Here, there is evidence connecting Mr. Heatherly's noncompliance with medication and treatment to his schizophrenia. People with schizophrenia commonly have deficits in insight and those who lack insight into their condition are less likely to stay in treatment and more likely to relapse. *What is Schizophrenia, Am. Psychiatric Ass'n*, http://www.psychiatry.org/patients-families/schizophrenia/what-is-schizophrenia (last accessed Aug. 18, 2026). Relevant to Mr. Heatherly's condition, his providers repeatedly cited his deficit in insight as a barrier to compliance with treatment. (*See, e.g.,* Tr. 504 ("Patient not interested in [antipsychotic] medications . . . Prognosis likely limited by insight and disinterest in clinically appropriate medication"); 484 ("Limited insight likely a barrier to staying consistent with outpatient mental health"); 1580 ("Prognosis: guarded [due to] poor medication compliance and limited supports")) (ordered chronologically). Mr. Heatherly's providers recommended him for other treatment services, including counseling, case management, inpatient treatment, intensive outpatient rehabilitation, and the STARS program (for a higher level of care), but he historically declined those services or disengaged with them after a short time. (*See, e.g.,* Tr. 354, 373, 380, 401, 421, 654, 760, 764). Mr. Heatherly also refused medications or was not compliant with taking them as prescribed. (Tr. 358, 401, 819, 1116, 1174, 1217). The ALJ's failure to explain how limited treatment is inconsistent with NP Spence's severe opinion when this evidence suggests his conditions may cause that limited treatment warrants remand. *Uhl,* 2021 WL 2188303, at *9.

Remand is therefore warranted for the ALJ to explain how the record undermines NP Spence's opinion that Mr. Heatherly's mental functioning is insufficient to do work-related activity on a sustained basis. Mr. Heatherly's ability to drive and graduate from high school as well as his limited and infrequent treatment would ordinarily be inconsistent with NP Spence's severe opinion. But the complicated record here is far from ordinary and those facts do not plainly undermine NP Spence's opinion. Without an explanation from the ALJ, I cannot meaningfully review the ALJ's conclusions. Because the ALJ did not properly articulate how she considered the persuasiveness of the state agency reviewers' prior administrative medical findings (*see infra* Section III), the ALJ's analysis is not salvaged by the finding that NP Spence's opinion is "not consistent with any other medical opinion or prior administrative medical finding." (Tr. 848).

**II. Dr. Misja**

Mr. Heatherly next contends the ALJ did not follow the Court's order on remand when she reconsidered the persuasiveness of Dr. Misja's opinion. (ECF #9 at PageID 1692-93). In the prior unfavorable decision, the ALJ concluded Dr. Misja's opinion was "not fully persuasive" in part because his statement that Mr. Heatherly has severe problems responding to supervisors and work pressure was inconsistent with the findings on functioning tests, his cooperative behavior, and his self-described daily activities. *Heatherly I*, 2024 WL 4181711, at *13. Relying on Sixth Circuit precedent, I found the ALJ's evaluation was not supported by substantial evidence in part because the ALJ did not show that Mr. Heatherly can perform the cited daily activities on a sustained basis. *Id.* at *14 (citing *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 838 (6th Cir. 2016)). I ordered remand on that issue and other issues. *Id.* at *13-14. I did not specifically instruct the ALJ

to show that Mr. Heatherly could have performed those activities on a sustained basis; rather, I directed the ALJ give Dr. Misja's opinion additional consideration. *Id.* at *14.

**A. The ALJ followed the District Court's order on remand.**

When a district court vacates the Commissioner's decision and remands for further proceedings under Sentence Four of 42 U.S.C. § 405(g), the Sixth Circuit recognizes that generally, "on remand of a case after appeal, it is the duty of the . . . agency from which appeal is taken[ ] to comply with the mandate of the court and to obey the instructions therein without variation and without departing from such directions." *Mefford v. Gardner,* 383 F.2d 748, 758 (6th Cir. 1967). Thus, "if the cause is remanded with specific directions, further proceedings in the . . . agency from which the appeal is taken must be in substantial compliance with such directions; and if the cause is remanded for a specified purpose, any proceeding inconsistent therewith is error." *Id.* Deviation from a court's remand order is subject to reversal on further judicial review. *Sullivan v. Hudson,* 490 U.S. 877, 886 (1989).

Presently, Mr. Heatherly posits "the ALJ failed to address [his] ability [ ] to sustain the activities which were relied upon as the basis for erroneously failing to adopt the limitations set forth by Dr. Misja." (ECF #9 at PageID 1692). To be clear, the ALJ did not make findings concerning Mr. Heatherly's daily activities on her second pass at evaluating Dr. Misja's opinion. Instead, she provided new reasons for finding the opinion less persuasive. Essentially, although the ALJ does not assert those activities are inconsistent with Dr. Misja's opinion in the current decision, Mr. Heatherly contends the ALJ was required to address his ability to sustain those daily activities on remand. From the later record, it is clear the ALJ followed the general remand order by reconsidering Dr. Misja's medical opinion. I find no error in this respect.

### B. The ALJ properly considered Dr. Misja's observations that Mr. Heatherly had difficulty focusing and required redirection during the evaluation.

Mr. Heatherly also contends the ALJ erred by not adopting Dr. Misja's opined restrictions "regarding his difficulty focusing and need for redirection." (ECF #9 at PageID 1693).

Dr. Misja opined that "[p]roblems in [maintaining attention, concentration, persistence, and pace to perform tasks] are likely to be in the intermediate range" but did not suggest any specific restrictions. (Tr. 682). In support of that opinion, Dr. Misja cited his observation that Mr. Heatherly struggled to maintain focus and needed frequent redirection during the interview. (*Id.*). Mr. Heatherly appears to incorrectly equate Dr. Misja's findings on examination with the doctor's opinion as to his capabilities. Indeed, Dr. Misja did not propose Mr. Heatherly needs, for instance, someone to stand by his workstation and redirect him to task; only that he observed Mr. Heatherly's difficulties with maintaining focus during the interview, leading to his conclusion that Mr. Heatherly's limitations in maintaining attention, concentration, persistence, and pace are in the intermediate range. As will be seen, that distinction extinguishes the basis for Mr. Heatherly's asserted error.

In support of his argument, Mr. Heatherly relies on the guidance in Social Security Ruling (SSR) 96-8p, 1996 WL 374184 (July 2, 1996), and the Sixth Circuit's unpublished decision in *Kinney v. Comm'r of Soc. Sec.*, No. 23-3889, 2024 WL 2273365 (6th Cir. May 20, 2024). In *Kinney*, a state agency psychological consultant opined the claimant had the residual capacity to:

> complete tasks without a sustained production pace or stringent daily quota, in a setting where there is some flexibility in scheduling of breaks; could adapt and manage in a structured and predictable work setting, where major changes are explained in advance and she is given time to adjust to new expectations.

*Id.* at *2. The ALJ found the opinion persuasive because it was "generally consistent with and supported by the record as a whole" and adopted the limitations, except for the consultant's opinion that the claimant could work "in a setting where there is some flexibility in scheduling of breaks." *Id.* at *2. The Sixth Circuit agreed with the claimant's argument that the ALJ, having found the opinion persuasive, needed either to incorporate the "flexible break schedule" limitation into the RFC or explain its omission, stating:

> An ALJ need not incorporate every limitation from a medical source's recommendation, even if it finds that medical source to be persuasive. *See Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). However, under Social Security Ruling 96-8p, if the ALJ's "RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." Here, the ALJ recited the limitations recommended by Dutt, including that Kinney required a flexible break schedule, and noted that he found those limitations to be "consistent with and supported by the record as a whole" and "persuasive." However, the ALJ—without explanation—then omitted that limitation from his RFC and his hypothetical to the VE. Without any limitation related to flexible break scheduling, the RFC conflicted with Dutt's medical opinion concluding such flexibility would be necessary, and the ALJ was obligated to explain the omission. *See Dunlap v. Comm'r of Soc. Sec.*, No. 20-4179, 2021 WL 5371401, at *7 (6th Cir. Sept. 20, 2021) (order). The failure to either incorporate the limitation or explain its omission was an error.

*Id.* at *3 (record citations omitted).

Here, the ALJ determined Dr. Misja's opinion concerning attention, concentration, persistence, and pace to perform tasks was somewhat persuasive because it is supported by the diagnosis of ADHD and the doctor's *observation* that Mr. Heatherly had difficulty focusing during the interview. The ALJ was less inclined to rely on Dr. Misja's *observation* that Mr. Heatherly needed frequent redirection because his mental status examination did not reveal a corresponding deficit. (Tr. 851). Thus, "difficulty in focusing" and "redirection" are not opinions on Mr. Heatherly's capabilities, but evidence supporting the "intermediate" severity of his deficits in that

area of mental functioning. *Kinney* is thus not applicable and Mr. Heatherly's argument that the ALJ erred in not adopting those "limitations" or explain their omission is misplaced.

Mr. Heatherly has not shown error on that basis, nor has he raised other articulable claims concerning Dr. Misja's opinion. I thus decline to order remand on such grounds.

**III. State Agency Reviewers**

Last, Mr. Heatherly asserts the ALJ erred by not adopting the state agency reviewers' restrictions addressing his "ability to maintain attention and concentration on a full-time and sustained basis" and "fail[ed] to place any limitations on [his] attention and concentration" at all. (ECF #9 at PageID 1693). He does not develop this argument beyond mere conclusion.

Here, relevant to concentration, persistence, and pace, the state agency reviewers determined Mr. Heatherly can complete one-to-four-step work-related tasks that do not involve prolonged periods of attention and concentration. (Tr. 67, 75-76). The ALJ rejected the limitations because they were vague, imprecise, and not posed in vocationally relevant terms, and instead concluded Mr. Heatherly can maintain concentration, persistence, and pace for work duties that are short cycle, repetitive, and routine in nature. (Tr. 854). While the ALJ did not explain how she considered the supportability or consistency of the state agency reviewers' restrictions, that is not a basis to remand because the ALJ's RFC reflects those same limitations.

Even where an ALJ finds an opinion persuasive, "there is no requirement that an ALJ adopt a state agency psychologist's opinion[] verbatim." *Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). The Sixth Circuit, in *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437 (6th Cir. 2014), concluded that, "the limitation to simple, routine, and repetitive tasks adequately conveys [claimant's] moderately limited ability 'to maintain attention and

concentration for extended periods.'" In so ruling, the Court expressly found that an RFC limitation to simple, routine, and repetitive tasks does address a moderate limitation in a claimant's ability to maintain concentration, persistence, and pace. *Id.* Here, the ALJ's RFC is slightly different, limiting Mr. Heatherly to work tasks that are short cycle, repetitive, and routine. (Tr. 843). Although the ALJ neglected to define "work duties that are short cycle," other courts evaluating this term in the Social Security context have found "short cycle" to mean "simple and repetitive." *See Diloreto v. Comm'r of Soc. Sec.*, No. 2:20-cv-2385, 2021 WL 2024590, at *6 (S.D. Ohio May 21, 2021), *report and recommendation adopted*, 2021 WL 2334268 (S.D. Ohio June 8, 2021). Despite the differing terminology, it appears the ALJ's RFC is consistent with a limitation to simple, routine, and repetitive tasks.

Under the former regulations governing the ALJ's evaluation of medical opinions, the Sixth Circuit determined that when an ALJ does not strictly comply with legal procedures for evaluating opinions, such error may be harmless when (1) the opinion is so patently deficient it could not be credited, (2) the ALJ adopted or made findings consistent with the opinion, or (3) the ALJ met the goal of these procedural safeguards. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004). District courts in this circuit continue to apply that harmless-error standard under the current regulations. *See Musolff v. Comm'r of Soc. Sec.*, No. 1:21-cv-1739, 2022 WL 1571864, at *13 (N.D. Ohio Apr. 27, 2022) (collecting cases). Applied here, the ALJ's failure to explain how she considered the supportability and consistency of the state agency reviewers' opinions is harmless error.

Accordingly, I decline to order remand on this basis.

## CONCLUSION

After reviewing the record, the parties' arguments, and the law, I **REVERSE** the Commissioner's decision denying supplemental security income and **REMAND** for additional proceedings consistent with this Memorandum Opinion and Order.

Dated: August 28, 2026

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE